**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

TINA PETERSON,

    *Plaintiff*,

vs.

CIGNA HEALTH AND LIFE
INSURANCE COMPANY and
TBC CORPORATION,

    *Defendants*.

_____/

**COMPLAINT**

Plaintiff, Tina Peterson ("Peterson"), sues Defendants, Cigna Health and Life Insurance Company ("Cigna") and TBC Corporation ("TBC"), as follows:

**NATURE OF THE ACTION, PARTIES,
JURISDICTION, AND VENUE**

1. This is an action arising under the laws of the United States, specifically the Employment Retirement Income Security Act of 1974, Title 29, United States Code, Sections 1000-1461 ("ERISA"), for Cigna's and TBC's wrongful denial of Peterson's health insurance benefits.

2. Peterson was at all material times a citizen and resident of San Antonio, Texas, and is in all respects *sui juris*.

3. Upon information and belief, Cigna was at all material times an insurance company with its principal place of business / headquarters in the State of Connecticut and engaged in the business of selling and / or administering health insurance and / or deciding health insurance claims throughout the country.

4. Upon information and belief, TBC was at all material times a corporation with its principal place of business / headquarters in Palm Beach Gardens, Florida and primarily engaged in the business of marketing tires for the automotive replacement market throughout the country.

5. This Court possesses original jurisdiction pursuant to Title 29, United States Code, Section 1132(e), and Title 28, United States Code, Section 1331.

6. Venue is proper in the Southern District Court of Florida pursuant to Title 29, United States Code, Section 1132(e) and Title 28, United States Code, Section 1391(b), since, for example, one of the Defendants (TBC) has its principal place of business / headquarters in Palm Beach Gardens, Florida.

7. All conditions precedent to the institution of this action (*e.g.*, administrative pre-suit appeals) have occurred, been performed, or been waived.

## COMMON ALLEGATIONS

8. At all material times, Peterson was covered by the health insurance plan offered and sponsored / self-funded (upon information and belief) by her husband's employer, TBC, and administered (upon information and belief) by Cigna. This plan bared Plan / Account No. 3199592 (the "Plan") and a copy of the Plan document is attached hereto as **Exhibit A**.

9. Peterson has battled an autoimmune disease of the nerve called Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP") for the past approximate three years of her life. While CIDP is not curable, the standard subject IVIG treatments (to which the subject claims denials relate, around which this litigation revolves) have resulted in this condition not ending Peterson's life (note: if not treated by IVIG, CIDP can paralyze chest

and neck muscles, which can choke a person to death) and / or resulted in greatly increasing Peterson's ability to maintain a fairly normal life (*e.g.*, not be wheelchair bound). And, indeed, as Peterson's medical records, reports / letters from treating physicians, and / or medical literature make clear, such treatment is the only medical course for Peterson that ensures she remains in her preferred state – alive and actually able to live her life somewhat.

10. From November 2013 through September 2014, Peterson was covered for her IVIG treatments by other insurance companies. For a few months (November 2014, January 2015, and October 2015), Cigna / TBC properly covered Peterson's IVIG treatments. But from February 2015 through March 2016 (other than October 2015, for some reason presently unknown), Cigna / TBC inappropriately pulled the coverage rug out from underneath Peterson in 180º fashion, citing lack of medical necessity and Peterson's continued, intermittent CIDP flare-ups as its reasons for cutting her benefits off.

11. From the time Cigna / TBC inappropriately cut Peterson's coverage off through March 2016, Peterson racked up well into the six figure range in medical bills that should have been covered by Cigna / TBC just like Cigna / TBC had previously covered, just like pre-Cigna carriers have covered, and just like her post-Cigna carrier (UnitedHealthcare) has covered from April 2016 through present.

12. The Policy sets forth myriad exclusions (*see* Ex. A at 69-71), none of which apply here.

13. The Policy sets forth myriad limitations (*see* Ex. A at 71), and the limitation that the carrier hangs its claims denial hat on reads as follows: "No payment will be made for expenses incurred for you … [for] expenses for supplies, care, treatment or surgery that are not Medically Necessary." *Id.*

14. The Policy defines "Medically Necessary" as follows:

> Medically Necessary Covered Services and Supplies are those determined by the Medical Director to be:
> - required to diagnose or treat an illness, injury, disease or its symptoms;
> - in accordance with generally accepted standards of medical practice;
> - clinically appropriate in terms of type, frequency, extent, site and duration;
> - not primarily for the convenience of the patient, Physician or other health care provider; and
> - rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical Director may compare the cost-effectiveness of alternate services, settings or supplies when determining least intensive setting.

Ex. A at 96. Although capitalized, the phrase "Medical Director" is not defined in the Policy's definition section.

15. The carrier's claim decision letters are the epitome of naked with respect to substantiation of the claims denials. For example, the carrier's April 16, 2015, letter simply reads as follows: "We found the service requested is not medically necessary in your case." This letter does not explain which of the above five medical necessity criteria was / is supposedly not satisfied.

16. Why is the carrier's claims denials correspondence unsubstantiated? Because reality (*e.g.*, medical records, opinions of treating physicians, medical literature, Peterson's positive IVIG results, commonsense) does not square with the carrier's claims decisions and, thus, the carrier's claims denials cannot be legitimately substantiated. Rather, reality makes clear, among other things, that (a) Peterson's IVIG treatments are required to preserve her life (which is by no means a matter of convenience), (b) Peterson's IVIG treatments are required to foster maintenance of a somewhat normal life (*e.g.*, maintaining mobility with her legs rather than with a wheelchair, which is by no means a

matter of convenience), and (c) there is no other effective, less costly alternative.  In sum, reality makes clear that Peterson's IVIG treatments are medically necessary.

17. For example, the medical records, medical literature, medical opinions, and *et cetera* are legion with the opinions of Peterson's treating neurologist, Dr. Suzanne K. Gazda, and Dr. Gazda has uniformly opined as follows:

> Ms. Peterson's neurological diagnosis is CIDP … .  She has had progressive weakness of the lower greater than upper extremities with the onset of symptoms in 2012.  This weakness involves more than 1 limb and she has associated neurological findings of areflexia in all limbs present for greater than 2 months.  Her electrophysiological findings are consistent with the diagnosis of CIDP, with prolonged F-wave latencies of greater than 2 motor nerves, reduced conduction velocity of greater than 2 nerves and prolonged distal latency of greater than 2 motor nerves.  Other causes of demyelinating neuropathy have been excluded; including Lyme disease, diphtheria, drug or toxin exposure, and she has no history to suggest hereditary demyelinating neuropathy, or prominent sphincter disturbance.  Her demyelinating work-up for central demyelination; i.e., MS has been negative.
>
> She has failed treatment with high dose Cytoxan and high does Prednisone.  It is of note these treatments were given prior to her EMG.
>
> This patient has no clinical findings or diagnostic studies to support a diagnosis like POEMS syndrome, osteosclerotic myeloma, diabetes, diabetic lumbosacral radiculopathy, PNS lymphoma, or amyloidosis.  There is no indication of multifocal motor neuropathy or IgM monoclonal gammopathy.  This patient responds beautifully to IVIG and has had remarkable improvement with IVIG dosing, but time is of the essence and her treatment is 100% medically necessary.  Without IVIG she would be 100% incapacitated and disabled, although with IVIG therapy on a regular monthly basis she has the chance over time to make significant recovery back to good health.

18. As another example, the medical records, medical literature, medical opinions, and *et cetera* are legion with the opinions of Peterson's treating rheumatologist, Dr. Pendleton Wickersham, and Dr. Wickersham has uniformly opined as follows:

> I would like to comment regarding Mrs. Tina Peterson's diagnoses and treatment.

Ms. Peterson has struggled for years with a complex autoimmune disease characterized by refractory chronic inflammatory demyelinating polyneuropathy (CIDP), systemic lupus erythematosus, rheumatoid arthritis, and multiple sclerosis. Over the past few years she has tried many aggressive therapies without adequate response. In fact, even recently she was unable to walk because of neuropathy and ensuing weakness related to a disease flare.

CIDP in particular is recognized as a severe challenging disease requiring aggressive immunosuppression for any hope of even partial response. Of note is that her disease has been refractory to a multitude of therapies, notably Cytoxan, Methotrexate, Humira, high dose corticosteroids and Rituxan.

Over the past year she has been improving with intravenous gammaglobulin therapy. This treatment has allowed her to regain her ability to walk and care for herself. Her pain has been much improved as well.

While there are no FDA-approved therapies for CIDP, the standard of care for severe refractory disease such as Ms. Peterson's is the aforementioned gammaglobulin therapy at high dose every four weeks. Despite evidence that this therapy was helping her, she was unable to receive such because of repeated denials by her insurance company. This led to a situation where, instead of having regular infusions, she would wait until a flare worsened enough to necessitate emergency admission to the hospital for gammaglobulin treatments.

While these inpatient treatments did help her, with each flare she would lose some of the gains she worked so hard with physical therapy to attain. In addition, she was repeatedly unnecessarily exposed to hospital environments where dangerous infections are a risk- especially for those with compromised immune systems.

There was initial confusion as to whether Ms. Peterson's nerve conduction study results met Cigna's criteria for gammaglobulin treatment of CIDP. Applying these strict criteria to her testing results, though, is erroneous as by the time of the testing she had already received intravenous cyclophosphamide and high dose corticosteroid treatments. These aggressive immunosuppressive therapies would be expected to alter testing results in general including nerve studies.

In short, Ms. Peterson has a combination of severe autoimmune diseases that have been controlled with aggressive therapy. Her health, though, was compromised because of her insurance's unwillingness to cover the clearly effective standard of care treatment for her rare disease.

19. Regarding Cigna's statement (in supposed support of its claims denials) that Peterson's CIDP continues to intermittingly flare-up, well, that is neither here nor there. Most (if not all) people with CIDP continue to experience intermittent flare-ups of same because, again, the condition is not curable. Again, IVIG significantly helps reduce the frequency of such flare-ups and significantly helps Peterson manage the condition in the best possible way by, for example, keeping her from choking to death *via* chest and neck paralysis and allowing her to maintain a somewhat normal life by not relegating her to a wheelchair.

20. Peterson's CIDP (and necessary, related IVIG treatments) plainly triggers the Policy's coverage grants, as evidenced by Cigna's / TBC's paying her IVIG-related claims for a period of time before deciding to pull the coverage rug out from underneath her.

21. At all material times, premium was paid in relation to the Plan, which such Plan was an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).

22. At all material times, the Plan was in full force and effect and was a legally valid and binding contract.

23. Peterson's medical providers have been remarkably patient in holding off on collecting the six figures worth of medical bills that have amassed until Cigna / TBC is made to do (or decides to do) the right thing; *i.e.*, made to (or decides to) fully indemnify Peterson. There is no guarantee, however, that Peterson's medical providers' patience will last much longer; *i.e.*, Peterson could be kicked into collections any day now, which, of course, would expose her to litigation and / or damaged credit all because Cigna / TBC has not yet tendered the insurance benefits to which she has long been contractually entitled.

24. Peterson exhausted the appeal process in an effort to accomplish Cigna's / TBC's doing the right thing sans litigation. More specifically, the appeal process recently culminated by way of an external reviewer's (MCMC's) April 20, 2016, letter upholding the wrongful claims denials. Hence, this lawsuit as Peterson's last resort.

25. Moreover, Peterson, *via* myriad pre-suit letters sent by undersigned counsel, attempted to obtain germane documentation / information from Cigna (the Plan administrator), as was her legal right, in order to fully assess the viability of her insurance claims and otherwise prepare for this litigation. Cigna decided to only oblige a few of the documentation / information requests and did not articulate any legally adequate objection as to the documentation / information requests it refused, ignored, or overlooked.

**COUNT I (AGAINST CIGNA AND TBC) – RECOVERY OF BENEFITS UNDER ERISA, 29 U.S.C. § 1132(A)(1)(B)**

26. Peterson re-alleges Paragraphs 1 through 25 as if fully set forth herein.

27. This is a claim to recover benefits and enforce rights under 29 U.S.C. § 1132(a)(1)(B).

28. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Peterson, as a participant in the Plan, is entitled to sue for judicial determination and enforcement of benefits.

29. Cigna / TBC improperly denied Peterson's claims for health insurance benefits to which she is entitled under the Plan, in contravention of the Plan documents and ERISA.

30. Peterson has no other adequate remedy at law to address the injuries she has suffered as a result of Cigna's / TBC's denial of benefits.

31. As a further result of Cigna's / TBC's refusal to provide benefits, Peterson has been forced to retain legal counsel to represent her in this matter and is accordingly

entitled to recover her reasonable attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

WHEREFORE, Plaintiff, Tina Peterson, requests the entry of judgment against Defendants, Cigna Health and Life Insurance Company and TBC Corporation, for damages including, but not limited to, past-due contractual benefits, attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1), costs incurred bringing this action, and for such other relief as this Court deems equitable, just and proper.

### COUNT II (AGAINST CIGNA) – RECOVERY OF ADMINISTRATIVE PENALTY UNDER ERISA, 29 U.S.C. § 1024(B), 29 U.S.C. § 1132(c)(1) AND 29 C.F.R. § 2575.502c-1

32. Peterson re-alleges Paragraphs 1 through 25 as if fully set forth herein.

33. This is a claim for administrative penalty under Title 29, United States Code, Section 1132(c)(1), Title 29, United States Code, Section 1024(b), and Title 29, Code of Federal Regulations, Section 2575.502c-1.

34. By October 12, 2015, letter (as well as myriad follow-up letters), Peterson (*via* legal counsel) asked Cigna to provide the following:

> Please provide me with copies of any and all documentation in the carrier's possession pertaining to Ms. Peterson, the subject policy / plan, and / or the subject IVIG-related claims. For example, and at minimum, please provide me with the following: (1) A complete, certified copy of the subject insurance policy / plan documents in effect at the times of the subject IVIG-related claims; (2) Copies of all correspondence and / or documents exchanged between the carrier and any of Ms. Peterson's medical providers regarding Ms. Peterson, the subject policy, and / or the subject IVIG-related claims; (3) Copies of all Ms. Peterson medical records in the carrier's possession; (4) Copies of all correspondence exchanged between the carrier and Ms. Peterson; (5) Copies of all correspondence exchanged between the carrier and any other party regarding Ms. Peterson, the subject policy, and / or the subject IVIG-related claims (less attorney-client privileged correspondence, of course); (6) Identification of the policy / plan language upon which the carrier's IVIG-related claims denials were based; (7) Contact information for any medical professionals who the carrier enlisted

in assessing the subject IVIG-related claims and / or related medical conditions; (8) Transcripts or audio recordings of any recorded statements or phone calls between the carrier and Ms. Peterson; (9) All guidelines, manuals, written protocol, or the like upon which the carrier partially or wholly based its claims denials; and (10) Copies of any other documents that the carrier partially or wholly relied upon in deciding to deny the subject IVIG-related claims.

I would also appreciate a breakdown of where all of the various IVIG-related claims stand. In other words, please advise as to which claims have gone all the way through internal appeal (such that they are now eligible for external review), please advise as to which claims have only gone through one level of internal appeal (such that there is one more level of internal appeal available), and please advise as to which claims have not yet undergone an internal appeal.

Equipped with this documentation / information, we will be in a better position to assess next step. Thank you in advance for the anticipated prompt response and cooperation.

35. Nearly two months later (which itself was a violation of the thirty day deadline, discussed below, within which a plan administrator must oblige germane documentation / information requests), by letter dated December 4, 2015, Cigna decided to only oblige a few of the documentation / information requests and did not articulate any legally adequate objection as to the documentation / information requests it refused, ignored, or overlooked.

36. This Court can (and, respectfully, should) assess a $110.00 / day penalty for every day gone by in which Cigna refused to provide Peterson with all of the germane documentation / information set forth in the October 12, 2015, letter quoted above.

37. Title 29, United States Code, Section 1132(c)(1)(B) afforded Cigna (as Plan administrator) thirty days to oblige Peterson's requests. Thirty days from the October 12, 2015, letter fell on November 11, 2015. Using November 12, 2015, as the penalty start date, the penalty totals $30,140.00 as of the date of this filing.

WHEREFORE, Plaintiff, Tina Peterson, requests the entry of judgment against Defendant, Cigna Health and Life Insurance Company, for damages including, but not limited to, penalties incurred by Cigna pursuant to Title 29, United States Code, Section 1132(c)(1), Title 29, United States Code, Section 1024(b), and Title 29, Code of Federal Regulations, Section 2575.502c-1, attorneys' fees and costs incurred bringing this action, and for such other relief as this Court deems equitable, just and proper.

Dated this 12th day of August, 2016.

        Respectfully submitted,

**MERLIN LAW GROUP, P.A.**
222 Lakeview Ave., Suite 950
West Palm Beach, Florida  33401
(561) 855-2120
(561) 249-1283 *facsimile*

/s/ Jeffrey L. Greyber_____
**Jeffrey L. Greyber, Esq.**
Fla. Bar No. 41103
jgreyber@merlinlawgroup.com
asasko@merlinlawgroup.com
*Attorney for Plaintiff*